All right, Mr. Cooper, we'll hear from you. Thank you, Your Honor. Bob Cooper on behalf of Sanford and Mid-Dakota Clinic. May it please the Court. This case arises in the context of the market realities surrounding the provision of and payment for health care in North Dakota, a state in which market concentration is not predictive of price for the dominant provider of private health insurance, and one of the largest health care systems in the country said that it will expand all relevant specialties in Bismarck and Mandan if the transaction is consummated. The overarching legal issue is what it means for the government to have a market share based rebuttable presumption, but still retain the ultimate burden of persuasion on a transaction's competitive impact. Analyzing a prospective transaction is an inherently predictive exercise. That prediction cannot be made in the abstract by applying a strict formula. Rather, it must be made by reference to the competitive conditions where a transaction is taking place. If the government shows a high level of, and an increase in, concentration in a properly defined market, then the rebuttable presumption, tethered to those statistics, arises. If the predictive value of the statistics is undermined, then the presumption falls away. Counsel, I want to throw you a little bit of a first principles sort of curveball question, and that is to return to the text of Section 7 of the Clayton Act, and in particular, it prohibits any acquisition that may substantially lessen competition, or, uses the disjunctive or, tend to create a monopoly. In the Brown's Shoe case, it suggested that if a merger creates a monopoly, you don't do anything more. You don't look at the competition, you don't look at sort of these other things because of the use of the word or in between. Now, we don't have a lot of case law in this circuit, so my question for you is, why wasn't it sufficient, just as a matter of the plain language of the provision in Brown's Shoe, for the government to prove that this tends to create a monopoly in the area? So, Your Honor, I think there are two answers to that. The first goes back to the statute itself, and you very accurately said what the statute does, but what the statute does not do is say that if a transaction yields a market share of X percent or greater, then it's prohibited. Congress could have written that statute, but they didn't. Market share is an analytical tool. Secondly, the term monopoly has to be read against that backdrop, not as a pure mathematical calculation, but as it's been defined in cases like Concord Boat, the ability to control prices or exclude competition. In this case, if the transaction is consummated, post-merger Sanford will have neither ability, the ability to control price or to exclude competition in a properly defined market. They wouldn't, but I guess my question for you then, are you objecting to the fact that this is a monopoly or a near monopoly, or are you objecting on the ground that there's, that competition won't be reduced? I'm, I'm, I'm object, both, I think is the answer. I, I, monopoly is not a strict mathematical exercise. A presumption can arise from the math, just like a presumption can arise from concentration or changes in concentration. But that presumption, rebuttable, is a starting point. The statute is looking ultimately to see is tech competition going to be harmed in a properly defined market, substantially reduced, or a monopoly. But the monopoly is not a simple mathematical equation, or else the inquiry would end there, simply with the numbers. Okay, I didn't mean to get you so far off track. Please proceed. It's quite all right. The government, as we, as I was alluding to, can use non-statistical evidence to meet its ultimate burden, but it does so without a presumption of any competitive effects. The presumption in Clayton Act cases arises from the statistics. And it's true that post-merger market shares can be a good predictor of what may happen, but they're not always a good predictor. That's why it's a rebuttable presumption. And market share examination is simply an analytical tool, which in this case was incorrectly replied, and resulted in the district court making several reversible legal errors. The first of those is that the court improperly shifted the burden of persuasion to defendants in two ways. By requiring a clear showing to rebut the presumption. Secondly, by requiring defendants to produce evidence that no anti-competitive effects are likely, in order to overcome the prima facie case. The second legal error was treating the presence of a powerful buyer, in this case, Blue Cross, in North Dakota, purely as a defense, thus shifting the burden to defendants. The third legal error was holding that there is no de minimis exception in antitrust law, which reads the words substantially out of the Clayton Act section that your honor was just quoting. In addition, the court used a market definition technique that is predicated on the ability of a hypothetical monopolist to successfully impose a price increase on commercial payers, because that is the market the government proposed and the court found here, commercial payers excluding government payers. And the court did this without ever assessing whether such a price increase could be imposed, which it could not. Now there were other legal errors as well, and if time permits, I will get to those relating to Synergy's and Mid-Dakota Clinic's future prospects. But the important point to really take away is that individually and collectively, these legal errors, and they are legal errors, led to a decision that treats the Clayton Act as a law that prescribes any merger unless the merging parties can prove their transaction is at least competitively neutral. That's not the law. The law does not demand that private business owners who wish to sell a business they created, even to a competitor, must prove, much less clearly show, a total absence of any alleged anti-competitive effects. Now, turning back to the burden issue, as I said, there are two errors embedded in the court's analysis, which really permeate everything that the court did. First, the court erred by requiring defendants to produce evidence that clearly shows no anti-competitive effects. This squarely contradicts then Judge Thomas's decision in Baker Hughes, where the D.C. Circuit said, by stating that the defendant can rebut a prime officiate case only by a clear showing, the standard in effect shifts the government's ultimate burden of persuasion to the defendant. This was not a random or accidental decision by the district court. The government invited the district court to apply this standard. The court accepted the invitation. Now, the government has argued in its brief, and undoubtedly you will hear soon, that the court didn't really do that. But the court did. The opinion itself says, since the plaintiffs have established that the proposed transaction is presumptively illegal, the burden shifts to defendants to produce evidence that clearly shows, clearly shows, that no anti-competitive effects are likely in order to overcome the plaintiff's prime officiate case. Couldn't the showing language, and far be it from me to disagree with Judge Thomas, or Justice Thomas, but my question for you is, isn't showing, couldn't that also be a reference to a burden of production? In Baker Hughes, I remember, talked about the fact that the greater the prime officiate case, the greater the showing needed to be by the opposing party. And the word show, as opposed to the word proof, could imply a burden of production, as the district court understood it. I don't, it could, Your Honor, but I don't think it does for two reasons. Number one, the quotation I believe you're referring to from Baker Hughes is where the court said, the more compelling the prime officiate case, the more evidence a defendant must present to rebut it successfully. I think what that means, in the context of that case in here, is that the more concentrated a post-merger market, the more compelling evidence a defendant has to present to cast doubt on whether concentration is a good predictive tool. That's what we've done here through both statistical and non-statistical evidence. Recall that the presumption itself is created without any reference to whether the statistics are reliable. If the statistics show a significant increase in concentration, in a properly defined market, then the presumption is created. But a presumption based on statistics that is subject to rebuttal by showing those statistics are not a good predictor of anti-competitive effects undermines it. Secondly, with respect to then-Judge Thomas, Justice Thomas' opinion in Baker and Hughes, that was written tracing an evolution away from Philadelphia National Bank. And Judge Thomas, then-Judge Thomas, excuse me, traces through the progression from General Dynamics to Marine Bank Corp. to CNS Bank. And what that progression shows is that the courts had gone too far, and a lessening of the burden, I believe, is the word the Baker and Hughes court did. And that makes sense when you go back to where the presumption comes from in Philadelphia National Bank. It is an inference from statistics. Well, let me ask you this. If we read it as a burden of production, the clear showing language, do you disagree, especially based on Baker and Hughes, that that would be appropriate? In other words, the greater the prima facie case, the greater the burden of production on those advocating for the merger. I may slightly disagree. I don't think it increases the burden of production. I think what it does is increase the type of evidentiary showing that must be made. And so, in a case like this where there is a statistical analysis done and unrebutted by Sanford and Mid-Dakota's expert that shows incomparable markets with comparable shares, incomparable practice areas in other North Dakota locales like Minot and Grand Forks, there is no correlation between price and concentration. I think that is an additional measure of evidence. I think where the main hospital system competing against Sanford in Bismarck and Mandan has testified not that they may, not that they might, but that they will go ahead and expand in each of these service areas. And if this transaction happened, and indeed has already started doing so, I think that rebuts the transaction. I think where you have a situation in which Blue Cross is a dominant provider throughout the state, sets statewide rates, has said in its own words that those rates are set in order to overcome provider leverage. Blue Cross operates effectively like Medicare. They set a statewide rate. Everybody pays the same rate. Everybody can participate in the same programs. I think in the face of all that, that's not changing the burden of production. That is exactly the type of more compelling showing that was talked about in Baker Hughes. I want to turn briefly to the other payers in the market as well. We've talked a little bit about Blue Cross. The other payer, there are two other payers. The second largest one is Sanford Health Plan, and suffice it to say, nobody is seriously contending that Sanford Health Plan is looking to raise prices on itself through this transaction. The other is Medica, and that's where the substantially language in the statute comes in. Medica is another payer that has a multi-state relationship with Sanford. It doesn't contract for individual services. It doesn't contract for individual locations. Both experts in this case projected a price increase for Medica based on modeling. Importantly, that is a small price increase here. It is a price increase that amounts to less than 1% of the overall market. This is not a case in which the government has suggested there are separate markets or price discrimination markets or sub-markets. A market for Sanford, a market for Blue Cross, a market for Medica. They've lumped them all together. Medica's business with Sanford is only 5% of the overall relationship. There is a de minimis impact projected on Medica, although none of that economic modeling has any way to account for the overall nature of the relationship. Moreover, the impact, small to begin with, is significantly reduced as soon as CHI does what it says it will do, increase its business. And CHI, remember, is not some new entrant. It's not a startup. It is a well-established entity in Bismarck with a stellar reputation, one of the largest health care systems in the country. And CHI is another story of how the burden was shifted. Notwithstanding all of that testimony, and we know from cases in this circuit, like Tenet, we know from Baker Hughes, competitors have an interest in downplaying what their plans are going to be in the case of a merger. CHI said exactly what they were going to do. Nonetheless, the district court required Sanford and Mid-Dakota Clinic to go ahead and prove affirmatively that there would be sufficient population for that expansion, even though one hospital system, CHI, said they were going to do it, and the other, Sanford, has hired 24 physicians in the last couple of years and announced plans over the next four to hire another 136 in Bismarck and Mandan. So that's just another illustration of where the burden has been inappropriately shifted to Sanford and to Mid-Dakota Clinic to show that they have no— to clearly show that there are no anti-competitive effects associated with this transaction. That's an inappropriate burden shift. It permeated the entire analysis, and it's a basis to reverse on that grounds alone. I'd like to reserve the balance of my time for rebuttal, if that's okay with Your Honors. There are only ten seconds remaining, so you probably won't have any rebuttal time, but I did want to ask you just one administrative question. Why do the briefs in this case have to be under seal? It's unusual to have a public proceeding like this where the whole argument is under seal. Couldn't you file something that eliminates whatever proprietary information is concerning and have the briefs filed publicly? I will answer the part I know and then the part I think is correct. The part I know is that during the trial there was a substantial amount of proprietary information, rate-related information, some proprietary business strategy, but mostly related to rates, and at various times the court sealed the courtroom. Both sides worked very hard in order to limit the amount that was done, and then in the district court the briefing was redacted and there were public filings here. My understanding at this court, and this is the part I'm less certain on, is that we were told not to file the redacted briefs on the public record, that we were told if the briefs are filed under seal, file that way, and do not submit the redacted ones. We would be happy to do so. We have them and could do it on a moment's notice if Your Honor would like it done. Okay. That might have been some communication with the clerk's office of which we're unaware, so thank you for that background. Sure. I'm sorry, Ms. Arrington, we'll hear from you. Good morning, Your Honors. May it please the Court, Michelle Arrington presenting argument for the Federal Trade Commission and our co-appellees, the State of North Dakota at the table with me. I'll just pick up with the last point. Yeah, that was our understanding based on our conversations, but we'd be happy to submit public briefs if Your Honors would like. Your Honors, starting with the language of Section 7, this Court, as this Court has recognized, that language tend to create a monopoly in this case. We have a case that doesn't just tend to create a monopoly, it does create a monopoly that hasn't been seriously disputed in one relevant market, near a monopoly in other relevant markets. I think what that language shows is that their monopolies present a particular concern, and the prediction of anti-competitive effects from those types of transactions are very, very strong. Because of the complete elimination of competition, there needs to be a serious rebuttal to undermine the statistical case and moving to the non-statistical evidence in this case, where not only did we have an extraordinarily strong statistical case, but we had a case that was bolstered by abundant non-statistical evidence, economic analysis, evidence from market participants, from defendants themselves, their own business record, the other insurers in the market, that bolster the prediction from the HHI numbers, that this case is highly likely to be anti-competitive. Now, turning to Mr. Cooper's arguments, there was no legal error here. The Court, what they're disputing, really, are factual findings that the District Court made, so walking through all of the evidence very carefully, laying it out, the government's case, their arguments, their evidence, and finding that the case overwhelmingly supported, that the evidence that was in the record, and interpreting that evidence, that that supported the government's case. Well, the issue on the clear lease show seems to be a pretty clear legal issue. The magistrate cited the correct standard, but then said clearly it shows later on, and that's not a factual issue, that's a legal question. What do we do with that? Well, our perspective is that there is no meaningful difference in the context of this case, in the context of not just a purely statistical case, but a case where the statistics and the prediction of competitive harm is bolstered by abundant other evidence. Now, Baker Hughes arose in a specific context where the government relied solely on market share statistics, and the District Court had found that those market share statistics were unreliable predictors of competition in the future. Market share was volatile, shifting, and the government did not have any, it just rested purely on the market share statistics. Baker Hughes was addressing the problem of not just rebutting those market share statistics, but calling on the defendants to do something more when they had already undermined those statistics. The court also recognized that the more compelling the prima facie case that the government presents, the more evidence the defendants must present to rebut it successfully. Here, the government presented a more compelling case, and I do not believe, as Mr. Cooper said, that that is limited, that more compelling language is limited to a statistical showing. Our case was a more compelling statistical showing in terms of the predictive effects that one can figure will come from a complete merger to monopoly, but in this case, we had evidence that not only supported the prediction of competitive harm, it also anticipated their rebuttal arguments and addressed that by putting forward evidence that showed that, to the contrary, the things that they said about entry. Yeah, that. So, on Blue Cross, several things. One is the record evidence from both Blue Cross, Blue Shields represented itself, and a specific example in the record where it showed that, in fact, powerful providers, notwithstanding the fact that Blue Cross, Blue Shield uses statewide pricing, that that statewide pricing accounts for, and the level that it sets the statewide pricing, accounts for the influence and the demands of powerful providers. Blue Cross, Blue Shields witness testified to that. There is, in addition, a specific example of a near-monopolist provider in North Dakota that exercised its leverage, and this is what the district court found. It examined that scenario. It heard a defendant's interpretation of that, but it looked at the testimony of Blue Cross, Blue Shield, and it looked at the material relating to that example, and it found that that showed that a near-monopolist provider can and has exercised leverage to obtain concessions from Blue Cross, Blue Shield. The demands, the evidence showed, and this is what the district court found, that the effects of monopolist provider leverage may be felt statewide by raising rates across the board, but that doesn't undermine the concentration numbers. It just shows that the statewide rates account for provider leverage in setting that level. In addition... What about CHI? I gather your point is it would be too little too late, or how would you put it? We would put it. Well, first of all, I do want to make sure that we don't forget about Medica. Their Blue Cross, Blue Shield arguments don't touch Medica. They don't touch non-price competition, so I can address that further. But with regard to CHI, and the legal standard for entry in order to counteract the probable anti-competitive effects that we've demonstrated, the legal standard is that entry needs to be, and the burden is on them to come forward and show this in order to rebut the vast amount of evidence of harm that the government put forward, needs to be timely, likely, and sufficient. And what the evidence showed, and this is a factual dispute. They're trying again to cast this as a legal error, but this was pure facts. Abundant evidence in the record. The district court cited to it, not just CHI. Witness testimony, testimony of their own doctors, of an independent doctor in the community that testified about the obstacles and the length of time that it takes to bring doctors to this community. And in particular, a CHI witness testified, and our expert Dr. Sacker, in his report, bolstered this evidence that it is not, in order to replace, this is the sufficiency aspect of it, in order to replace lost competition, it's not just a matter of coming into the community, even if they could, over the number of years that the witness from CHI testified come in, it would not replace immediately the lost competition, because you have to build up a patient base, you have to build up the relationships, a reputation, and those providers will not be sufficient to replace the lost competition from the existing doctors until that happens. And that will happen over multiple more years in addition to just the entry. In addition, the question, and it is a very real question that was raised by the CHI witness, that there is doubt as to whether this market is saturated with at least respect to some of these services. And in light of that evidence, yes, it was incumbent on them, if they wanted to prevail on their rebuttal, to present evidence that addressed that. That was not improper burden shifting. It was not an improper shifting of the burden of persuasion. It was a recognition by the district court that there was evidence presented that called that into serious question. And if they wanted to fully and robustly rebut an evidentiary showing that the government made, they should have addressed that, and they did not. Mr. Cooper said that the FTC actually injected the clearly shows standard into the case through its briefing. Is that the agency's view, that that standard from the Philadelphia case is still the correct statement of law? Your Honor, that Supreme Court case is a valid Supreme Court case. It has not been overruled, not that provision. And as a matter of fact, I will note that in their brief opposing the preliminary injunction, which can be found at docket 117, I believe, page 11 of that PDF, they cited the very same language. Okay, so you really are defending that then as the correct standard. You're not saying it was wrong but immaterial here. You're saying we should reject their argument on clearly shows and say that is the right standard. I think in the context of this case where, and I think it's consistent with Baker Hughes, Baker Hughes saying that the more compelling- So you say it depends on how strong the showing is. Exactly, and that makes sense because the rebuttal, it's not, if the government, that's what a rebuttal case is. It's to address the showing that the government made. And if the government makes a particularly strong showing, as was the case here, that's not just astronomical concentration statistics and the showing, which they've never disputed, really. There's complete elimination of competition here. In one relevant market, there is absolutely no additional competition. Was there anything else other than the market concentration that was part of the government showing at the prima facie case stage? I know you responded to a lot of the arguments that were made by Sanford, the specific arguments, but was there more that the government came forward with? Yes, so the government's economic analysis, economic testimony that shows it's not just a matter of concentration, but this is how competition in this market works. This is how market power is exercised. It's exercised at the bargaining stage between the health care providers and the insurers. And that's where, if you have, again, this was Dr. Sacker, our economic expert, that if you have the two close competitors, unquestionably the parties in this case, if they provide alternative networks that insurers can turn to one or the other to construct a marketable network, when you take that away and there is no alternative, that augments the bargaining leverage of the providers. It diminishes the leverage and the ability of the insurer to counteract that. That also is a non-statistical explanation and evidence about how this market works, how competition in this market works. And they did not present evidence that convinced the district court. The district court had alternative explanations. They cited to the Blue Cross Blue Shield statewide rates. That was effectively their argument. It's a circular argument because if that statewide pricing doesn't address, in this case, it obscures the ability of powerful providers to affect the statewide rates. So that strongly bolstered the concentration statistics, the prediction that will flow from the elimination of these two very close competitors. In addition, I would like to mention their Medica arguments. Their arguments, they try to sweep that under the rug, say you can ignore that because that's de minimis. De minimis, they're conflating the question of substantial lessening of competition with the amount of commerce affected. Substantial lessening of competition here is unquestionable. It is the elimination of really the only competitor in some of these service markets. That is elimination of competition. Our evidence showed from the economic testimony, from the testimony of market participants, what the effects are going to be. The insurers will have no alternative. They will have no ability, if they want to stay in this market, to counteract that bargaining. Just because Medica, which I think has only 2% of the market, would possibly have to raise prices in this market, it's a piece of evidence, but it doesn't necessarily lead to the conclusion that this merger is anti-competitive, does it? Again, we're talking at the preliminary injunction stage of predictions of what will likely happen. In this case, it bolsters the concentration analysis. In addition, this is market-wide. This is not just Blue Cross Blue Shield or Medica. The non-price effects in this case, which will affect the entire population base and all of the insurers, and there is direct head-to-head competition for patients, which unquestionably the district court made factual findings, factual findings 79, 80, 81 in its decision. That there has been head-to-head competition that has spurred each of them to invest in new technology to expand services. And that is something that has benefited all of the population. And that unquestionably will be eliminated with this competition. Your Honor, it's based on this. We request that you affirm the preliminary injunction in this case. Very well. Thank you for your argument. I believe all the time has been used, so we thank you both for your arguments. The case is submitted, and the court will file an opinion in due course. Please call the next case for argument.